**UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK BUOL, an Individual,<br><br>Plaintiff,<br><br>-against-<br><br>LUCKI CAMEL JR. p/k/a "LUCKI", an Individual,<br><br>Defendant. | Case No. 1:26-cv-7714<br><br>**COMPLAINT**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

Plaintiff Mark Buol ("Plaintiff"), by and through his undersigned attorney, for his Complaint against Defendant Lucki Camel Jr., professionally known as "Lucki" ("Defendant"), alleges on personal knowledge as to his own action, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. Plaintiff is an experienced personal manager of artists in the music industry. Among his other accomplishments, Plaintiff previously was the Vice President of A&R (artists and repertoire) at Empire Distribution, Records and Publishing Inc. ("Empire"), a record distributor where Plaintiff worked for almost 8 years.

2. Defendant is a Chicago-based artist who is a performer, songwriter, recording artist, and producer in the rap/hip-hop genre of music.

3. Plaintiff and Defendant initially met and became acquaintances in 2016. In the Spring of 2017, Plaintiff and Defendant met and discussed on multiple occasions the possibility of Plaintiff serving as the personal manager for Defendant. In 2021, after firing two previous managers, Defendant asked Plaintiff to become his manager.

4. At that time, Defendant expressed his desire that Plaintiff simultaneously act as his personal manager in addition to serving in his A&R role at Empire for Defendant's account.

5. In fact, it was a common practice within Empire to have its employees simultaneously act as personal managers for their artists, a practice that Defendant was aware of at the time and specifically condoned.

6. Plaintiff agreed to take on the substantial and daunting task of managing Defendant's career, which, despite Defendant's talent, was in deep distress due to Defendant's chaotic business practices and erratic behavior. The terms of Plaintiff's agreement to manage Defendant (the "Management Agreement") provided that, in exchange for Plaintiff's valuable management services, Defendant would: (a) pay Plaintiff a 15% commission on all of Defendant's gross income earned in the entertainment industry; and (b) promptly reimburse Plaintiff for every dollar that Plaintiff chose to advance to Defendant to cover Defendant's expenses.

7. The industry standard for payment of a personal manager such as Plaintiff is a 20% commission on the client's gross income. Indeed, Defendant paid his previous personal managers a 20% commission. Nonetheless, Plaintiff agreed to take a lower commission, in the amount of 15% of gross income, provided Defendant hire an accountant to manage Defendant's financial affairs. (The typical compensation for an accountant or business manager is 5% of the client's gross income.)

8. Defendant mismanaged his financial affairs, including by failing to pay creditors monies he owed them; he did not possess a credit card, and was notorious for accepting paid features without ever actually delivering a verse in return. Plaintiff recommended to Defendant that he hire an accountant to resolve Defendant's issues of financial mismanagement and make

Defendant's financial operations more professional. Although Defendant agreed to hire an accountant, he never actually engaged an accountant for more than a short, trial period. As a result, in addition to serving as Defendant's personal manager, Plaintiff was asked to, and did, perform many of the same functions of a business manager for Defendant.

9. While he was acting as Defendant's manager, Plaintiff simultaneously handled A&R for Defendant at Empire. As a result, Defendant benefited directly from Plaintiff's relationship with Empire, including access to insider influence within Empire's sphere of operations. At all relevant times, however, Plaintiff's primary loyalty remained to Defendant.

10. Plaintiff went above and beyond the call of duty in providing personal management services to Defendant. For example, he bankrolled Defendant's tours, advanced the funds for Defendant to pay a large settlement of claims asserted against Defendant by a third party, coordinated logistics for Defendant's travels, provided advice to Defendant regarding how to maximize revenue from the exploitation of his recordings and musical recordings, recovered royalties for Plaintiff, and generally professionalized a career that theretofore had been marked by instability and chaos.

11. Over the course of their five-year relationship under the Management Agreement, Plaintiff transformed Defendant from a struggling artist into a commercially viable brand. Plaintiff's financial support and strategic guidance were instrumental in breaking Defendant into mainstream markets, significantly expanding his fan base, and establishing him as a chart-topping artist. Industry veterans have repeatedly acknowledged Plaintiff's pivotal role in this transformation. Despite Plaintiff's unwavering support and financial backing, Defendant responded with calculated deceit and sabotage, as explained below.

12. During Plaintiff's management tenure, Defendant regularly performed live

concerts at various venues around the United States and Canada, including performing regularly in New York City as part of his tours and one-off shows, from which Defendant earned revenues commissionable by Plaintiff under the Management Agreement.

13. As Defendant's career grew, so too did Defendant's wealth. For example, through Plaintiff's business relationships, Plaintiff introduced Defendant to Sony Music Publishing (a major music publisher whose principal offices are based in New York City) for the purpose of securing a publishing agreement with Sony. As a proximate result, Defendant entered a music publishing administration agreement with Sony, generating a seven-figure advance for Defendant, which advance was commissionable by Plaintiff under the Management Agreement.

14. In February 2024, just weeks before Defendant's scheduled tour of Canada, Plaintiff informed Defendant that he was no longer comfortable fronting the costs associated with Defendant's tour business. This disclosure prompted an argument between Plaintiff and Defendant, which in turn led to disorganization during the tour's first several shows.

15. Matters came to a head in a subsequent, more serious confrontation at Defendant's hotel, during which Defendant demanded that Plaintiff provide funds to help cover the cost of the tour, stating that if Plaintiff was profiting from the tour, he should be required to "put it back up." Following this confrontation, Plaintiff notified Defendant that he was terminating his services as personal manager and departed the tour. That same night, Defendant performed a truncated twenty-minute set, and at the next scheduled concert, failed to appear altogether. As a result, the remainder of Defendant's tour was cancelled.

16. The following month, Defendant contacted Plaintiff and asked him to resume his personal management services. During this conversation, Plaintiff agreed to do so, based upon Defendant's promises that he would professionalize his business practices, including (without

limitation) by hiring a business manager or accountant, opening a business bank account, and obtaining a credit card for business expenses. Defendant agreed to do so.

17. Plaintiff was ready, willing, and able to resume his duties as personal manager. As Defendant's upcoming tour approached, Defendant sent Plaintiff photographs purporting to show Defendant opening a business bank account, represented to Plaintiff that Defendant was then depositing over $100,000 into the business bank account, and that the monies in the account would fund Defendant's upcoming tour. Defendant also promised to give Plaintiff a business credit card to cover Defendant's mounting tour expenses. These representations, upon which Plaintiff justifiably relied when resuming his managerial duties, turned out to be false.

18. At or about that time, Plaintiff discovered that Defendant's banking relationship with JPMorgan Chase was unilaterally terminated by the bank due to alleged banking irregularities. As the tour was about to commence, having resumed his role as Defendant's personal manager, Plaintiff felt he had no choice but to personally fund the tour's expenses pending receipt of the promised business credit card. Defendant, however, never provided Plaintiff with the credit card. As a result of Defendant's failure to do so, Plaintiff was forced to finance the tour in its entirety, substantially depleting his liquid savings and maxing out his personal credit cards. This left Plaintiff in a position of severe financial hardship.

19. Plaintiff continued to dutifully assist Defendant with his career, including by advancing his own funds to Defendant in order to keep Defendant's tours operating and thereby preserve Defendant's professional viability. Defendant, however, further undermined the parties' relationship by covertly diverting Plaintiff's rightful commissions. Specifically, Defendant instructed Empire — the record label that distributed his musical recordings nationally, including within this District — as well as his tour promoter and other entities responsible for remitting

payments to Defendant, to cease paying Plaintiff the agreed-upon 15% commission on revenues owed to him, and to instead divert those monies into Defendant's own bank account. When confronted by Plaintiff regarding this misconduct, Defendant initially stated that he would resolve the issue but subsequently refused to engage in any further discussion with Plaintiff, effectively foreclosing any attempt at resolution.

20. Life on the road with Defendant became increasingly untenable. Despite Plaintiff's continuous financial support and managerial services, Defendant's behavior escalated into recklessness and increasingly juvenile misconduct. Defendant insisted on staying exclusively at five-star hotels, incurring exorbitant costs that Plaintiff was forced to cover. Yet, Defendant repeatedly caused damage to these hotel rooms — including shattering a television at the Nobu Atlanta, incurring over $6,000 in charges in a single night at the Tampa EDITION hotel, and damaging a room at the Thompson hotel in Dallas. These destructive incidents, combined with excessive room-service charges and unauthorized guest accommodations, resulted in thousands of dollars in damages, all of which were billed to Plaintiff's personal accounts, further compounding his financial exposure.

21. As Plaintiff's financial exposure and personal risk mounted, he requested that Defendant provide him with the overdue payments owed and that the parties enter into a formal settlement agreement. Rather than comply with these eminently reasonable requests, Defendant repeatedly told Plaintiff to "stay out" of his "business," threatening that he would "make sure no one ever worked with [Plaintiff] again."

22. Two days later, without provocation, Defendant responded with a calculated smear campaign, leveraging his substantial social media following to unfairly damage Plaintiff's reputation. Specifically, Defendant took to Twitter, publishing a series of disparaging posts

regarding Plaintiff to his approximately one million followers. This was not a spontaneous outburst, but rather a deliberate and calculated effort by Defendant to publicly discredit Plaintiff, undermine his standing in the industry, and shift blame in order to evade Defendant's substantial financial obligations.

23. Through this ongoing pattern of deliberate misconduct, Defendant has inflicted substantial financial harm upon Plaintiff, damaged his professional reputation, and exposed him to significant financial risk from creditors. This conduct demonstrates Defendant's willful disregard for Plaintiff's rights and constitutes a conscious effort by Defendant to exploit Plaintiff's resources while evading his clear contractual obligations.

24. Through this lawsuit, Plaintiff seeks full payment from Defendant of all past-due commissions and unreimbursed advances. Plaintiff further seeks consequential and incidental damages, statutory interest, and all available equitable and punitive remedies necessary to fully redress the severe harm caused by Defendant's malicious conduct.

## PARTIES

25. Plaintiff is an individual domiciled in New York City.

26. Upon information and belief, Defendant is domiciled in Los Angeles, California. Defendant is a producer, performer, songwriter, and recording artist in the rap/hip-hop genre of music.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000. Diversity of citizenship exists because Plaintiff is a citizen of New York and Defendant is a citizen of California.

28. This Court has personal jurisdiction over Defendant pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302 consistent with the Due Process Clause of the Fourteenth Amendment. Defendant has purposefully availed himself of the privilege of conducting business within the State of New York and this District, such that he should reasonably anticipate being haled into court here. Specifically, Defendant regularly transacts business within this District, including by: (a) regularly exploiting his musical recordings in New York by distributing, licensing, and selling those recordings to consumers and commercial users, including within this District; (b) entering into a substantial music publishing agreement with Sony Music Publishing, a company with its principal place of business located in this District; (c) performing concerts in New York, including performances within this District; and (d) receiving legal services from his attorney, who renders those legal services to Defendant from an office located in this District.

29. Defendant has purposefully availed himself of the privilege of conducting activities within New York and this District, such that he should reasonably anticipate being haled into court here.

30. The claims asserted in this action arise directly from Defendant's business activities in the Southern District of New York. The exercise of personal jurisdiction over Defendant in this District therefore comports with traditional notions of fair play and substantial justice.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and because Defendant is subject to personal jurisdiction in this District. Specifically: (a) Defendant regularly performs live shows within this District; (b) Defendant's music publisher maintains its principal place of business in this District; (c) Defendant's counsel in matters

related to the conduct alleged herein maintain offices in this District; (d) Defendant's sound recordings are distributed, marketed, and sold within this District; and (e) Plaintiff resides and/or maintains his principal place of business in this District.

32. Accordingly, Defendant has sufficient contacts with this District such that venue is proper and the exercise of personal jurisdiction over Defendant comports with due process.

## STATEMENT OF FACTS

### A. The Parties Enter into the Management Agreement.

33. In 2021, Plaintiff and Defendant entered into a management agreement (the "Management Agreement") pursuant to which Plaintiff agreed to provide personal management services to Defendant in exchange for an agreed commission on all gross income received by Defendant from his endeavors in the entertainment industry. Having witnessed Defendant's financial turmoil between 2019 and 2021, Plaintiff proposed that he would receive a fifteen percent (15%) commission instead of the industry standard twenty percent (20%), in exchange for Defendant hiring an accountant or business manager who would take an industry-standard five percent (5%) commission. Defendant agreed to these terms, but Defendant never actually engaged an accountant for more than a short, trial period.

34. The terms of the Management Agreement further provide that, to the extent Plaintiff chose to advance expenses or other funds to Defendant, Defendant would promptly provide Plaintiff with full reimbursement.

### B. Plaintiff Significantly Furthers Defendant's Career by Providing Expert Personal Management Services to Him.

35. In performing his duties under the Management Agreement, Plaintiff significantly increased Defendant's income and transformed Defendant from a struggling artist into a commercially viable brand. In addition to the day to day managerial services provided by

Plaintiff, the following are a few representative examples of additional valuable services provided by Plaintiff.

a. ASCAP Catalog Registration: ASCAP and BMI are performing rights organizations ("PROs") which pay royalties to songwriters and music publishers for the public performances of their musical compositions. A songwriter may only be a member of one PRO. However, in order for a songwriter to receive royalties from a PRO, the songwriter's musical compositions must be registered with the PRO. Upon the initiation of the management agreement, Plaintiff discovered that Defendant's previous managers had not registered virtually any of Defendant's musical compositions. Plaintiff painstakingly registered Defendant's entire catalog of musical compositions with BMI, a company that Plaintiff had worked with before. After registering many of Defendant's compositions, Plaintiff received a notice from BMI that Defendant's previous managers had signed an agreement with ASCAP, resulting in the termination of Defendant's BMI account. Thus, Plaintiff had to re-register each of Defendant's musical compositions with ASCAP. These registrations with ASCAP resulted in a one-time payment by ASCAP to Defendant of $177,284.74. But for Plaintiff's registrations with ASCAP, this and other payments from ASCAP to Defendant never would have been made, because royalties for a musical composition are only paid by ASCAP once that musical composition is registered with ASCAP.

b. Plaintiff's Provision of Crisis Management Services: Plaintiff successfully managed numerous crises involving Defendant. But for Plaintiff's expert crisis management services, Defendant's reputation and professional viability would have been injured significantly.

c. Distribution Deal: Defendant engaged business lawyers to renegotiate his Distribution Deal with Empire. Defendant's primary goal was to be paid a multimillion dollar

advance under the new deal. Plaintiff provided extensive financial modeling and coordinated with Defendant's legal teams over a period of several months. The deal renegotiated by Defendant's legal team included a provision pursuant to which Empire paid a multi-million upfront advance to Defendant, to which Plaintiff was entitled to receive a 15% commission as provided by the Management Agreement. Despite this, Defendant has only paid Plaintiff a mere $75,000.00 commission on that deal.

36. During the term of the Management Agreement, Defendant generated significant gross revenue — in the millions of dollars — from his many revenue streams, including but not limited to touring revenues, merchandise, music publishing revenues, public performance royalties, and income earned by the distribution of his sound recordings. Plaintiff remains substantially unpaid for his 15% share of these revenues, in an amount believed to be in excess of $1 Million.

**C. Plaintiff Advanced Substantial Sums of Money to or on Behalf of Defendant, Which Sums Remain Unreimbursed.**

37. During the term of the Management Agreement, Plaintiff advanced substantial sums to Defendant, in excess of $225,000.00, including funding Defendant's touring and music production activities. Many of these advances remain unreimbursed by Defendant. Plaintiff's unreimbursed advances to Defendant include, but are not limited to, the following:

a. Defendant's GEMINI Tour: Plaintiff personally advanced $214,822.00 in travel, parking, lodging, rentals, production, and bus costs for Defendant's 30-city U.S. tour, which was billed as the "GEMINI Tour." This amount remains entirely unreimbursed by Defendant. Further, Plaintiff remains unpaid for his 15% commission for merchandise on this tour. Defendant's merchandising for this tour was a resounding success that generated almost $1 million in additional, commissionable gross revenue for Defendant.

b. Hotel Damage Surcharges and Related Costs: Plaintiff advanced Defendant roughly $15,000 to cover hotel damage surcharges, including repair costs for a Nobu Atlanta hotel suite in which Defendant smashed a television and burned marks into hotel furniture with marijuana cigarettes.

c. Other Advances of Funds for Defendant's Personal Use: Plaintiff frequently acted as Defendant's financial safety net, advancing funds on short notice, covering unexpected costs, and managing financial crises that directly impacted Defendant's career. Plaintiff was forced to incur thousands of dollars in interest charges when Defendant delayed his reimbursement of these advances or outright refused to provide reimbursement. These wrongful acts by Defendant placed further strain on Plaintiff's personal finances, resulting in Plaintiff being forced to sell investment assets to cover his personal and business expenses.

38. Defendant's failure to fully reimburse Plaintiff for these financial advances constitutes a material breach of the Management Agreement.

39. As a direct and proximate result of these breaches, Plaintiff has suffered substantial financial harm.

**FIRST CAUSE OF ACTION**
**(Breach of Oral Contract)**

40. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

41. The Management Agreement constitutes a valid and binding contract between Plaintiff and Defendant.

42. Plaintiff fully performed his obligations under the Management Agreement, or alternatively, Plaintiff is excused from performing such obligations.

43. Defendant materially breached the Management Agreement by: (a) failing to pay Plaintiff a 15% commission on all gross revenue earned by Defendant in the entertainment industry; and (b) refusing to reimburse Plaintiff for all monies that were advanced or paid on Defendant's behalf.

44. As a direct and proximate result of the aforementioned breaches by Defendant, Plaintiff has incurred direct, consequential, and incidental damages in amounts to be determined at trial, but not less than $1.5 Million, together with interest thereon at the legal rate.

**SECOND CAUSE OF ACTION**
**(Quantum Meruit)**

45. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

46. Defendant has been unjustly enriched at Plaintiff's expense by retaining the benefits of Plaintiff's management services without full compensation and retaining monies advanced by Plaintiff to pay Defendant's expenses.

47. Defendant has not fully compensated Plaintiff for these services or reimbursed him for those expense monies advanced. If Plaintiff is not compensated for the work he performed and the monies he advanced, Defendant will be unjustly enriched and allowed to unjustly retain the benefits of Plaintiff's work.

48. Plaintiff is entitled to recover from Defendant the reasonable value of those services and advances, in an amount to be determined at trial, but not less than $1.5 Million. together with interest thereon at the legal rate.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment – Unreimbursed Expenses)**

49. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

50. Defendant has been unjustly enriched at Plaintiff's expense by retaining the benefits of Plaintiff advancing monies to pay for Defendant's business and/or personal expenses.

51. Defendant has not fully reimbursed Plaintiff for those advances. If Plaintiff is not fully compensated for the expenses he advanced, Defendant will be unjustly enriched.

52. It is against equity and good conscience to permit the Defendant to retain what is sought to be recovered.

53. Plaintiff is entitled to recover from Defendant the unreimbursed funds that he advanced to Defendant, in a sum to be determined at trial, but not less than $225,000.00, together with interest thereon at the legal rate.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment – Managerial Services)**

54. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

55. Plaintiff rendered to Defendant, under a reasonable expectation of compensation, and Defendant has accepted, valuable managerial services.

56. Defendant has been unjustly enriched at Plaintiff's expense by retaining the benefits of Plaintiff's services.

57. Defendant has not fully compensated Plaintiff for these services. If Plaintiff is not fully compensated for the services rendered, Defendant will be unjustly enriched.

58. It is against equity and good conscience to permit the Defendant to retain what is sought to be recovered.

59. As a result, Plaintiff has sustained damages in an amount to be determined at trial, but not less than $1.25 Million, together with interest thereon at the legal rate.

**FIFTH CAUSE OF ACTION**
**(Promissory Estoppel)**

60. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

61. Defendant repeatedly made clear and unambiguous promises to Plaintiff, including:

a. Promising payment of a 15% commission on all gross income earned by Defendant in the entertainment industry;

b. Promising to reimburse Plaintiff for all out-of-pocket advances made on Defendant's behalf, including tour expenses, crew payroll, and additional operating costs; and

c. Promising to engage an accountant.

62. Plaintiff reasonably relied on these promises to his detriment, by expending significant personal funds, devoting thousands of hours to Defendant's career, and forgoing other professional opportunities in reliance on Defendant's repeated assurances.

63. Plaintiff's reliance was both reasonable and foreseeable.

64. As a direct and proximate result of Defendant's broken promises, Plaintiff has suffered substantial financial harm, including lost commissions and unreimbursed expenses. Plaintiff is entitled to recover from Defendant the full amounts promised as well as direct, consequential, and incidental damages, to be proven at trial, but not less than $1.5 Million, together with interest thereon at the legal rate.

**SIXTH CAUSE OF ACTION**
**(Equitable Accounting)**

65. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

66. Plaintiff brings this cause of action in the alternative to the breach of contract claim. Plaintiff alleges that Plaintiff and Defendant entered into a personal management relationship under which Plaintiff provided management and related professional services to Defendant.

67. Under the parties' agreement and course of dealing, Plaintiff advanced and paid expenses on Defendant's behalf in connection with Defendant's professional activities as hereinabove alleged. Defendant agreed to reimburse Plaintiff for those expenses.

68. Under the parties' agreement and course of dealing, Plaintiff also earned commissions on all gross revenue earned by Defendant in the entertainment industry, including income received by or for Defendant from touring revenues, merchandise sales, music publishing revenues, public performance royalties, and income earned by the distribution of his sound recordings.

69. A relationship exists between Plaintiff and Defendant requiring an accounting because Defendant received and controlled information and funds from which Plaintiff's commissions and reimbursement rights must be determined.

70. The amount due to Plaintiff is unliquidated and cannot be determined without an examination of Defendant's books, records, receipts, disbursements, and other financial information. Plaintiff does not presently possess sufficient information to calculate the full amount of unpaid commissions, unreimbursed expenses, credits, offsets, and payments.

71. Given the complexity of Defendant's financial transactions for which Plaintiff is entitled to a commission, including tour revenues, merchandise sales, royalty payments, and publishing and recording advances, a full accounting is necessary to determine the precise amounts owed to Plaintiff.

72. Defendant maintains exclusive control over critical financial records, including but not limited to live performance settlement statements, Empire distribution reports, ASCAP royalty statements, banking and direct deposit records.

73. Plaintiff is entitled to a full and complete accounting of all the books and records that are maintained by Defendant in connection with his gross earnings in the entertainment industry.

74. Plaintiff requests that the Court order a full and complete accounting of all funds received and disbursed by Defendant in connection with his career in the entertainment industry, including but not limited to:

a. All payments and royalty statements from Empire, Sony Music Publishing, ASCAP, and all other payors of royalties to Defendant.

b. All tour revenues, merchandise sales, and live appearance revenues.

c. Any other sources of income subject to Plaintiff's 15% commission.

75. Accordingly, Plaintiff is entitled to an order of this Court directing Defendant to provide an accurate accounting which specifies in complete detail the information and documents necessary for an audit of his books and records and to make appropriate payment to Plaintiff as a result of that accounting.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment from this Court against Defendant as follows:

1. As to the First Cause of Action: Awarding all direct, consequential, and incidental damages in an amount to be determined at trial, but not less than $1.5 Million, together with interest thereon at the maximum legal rate.

2. As to the Second Cause of Action: For the reasonable value of Plaintiff's services, in an amount to be determined at trial, but not less than $1.5 Million, together with interest thereon at the maximum legal rate, as well as punitive and exemplary damages.

3. As to the Third Cause of Action: For the repayment of all monies advanced by Plaintiff to Defendant, in an amount to be determined at trial, but not less than $225,000.00, together with interest thereon at the maximum legal rate, as well as punitive and exemplary damages.

4. As to the Fourth Cause of Action: For compensatory damages, including all losses suffered by Defendant, in an amount to be proven at trial, but not less than $1.25 Million, together with interest thereon at the maximum legal rate;

5. As to the Fifth Cause of Action: For compensatory damages, including all losses suffered in reliance on Defendant's promises, in an amount to be proven at trial, but not less than $1.5 Million, together with interest thereon at the maximum legal rate;

6. As to the Sixth Cause of Action: An order of this Court directing Defendant to provide an accurate accounting which specifies in complete detail the information and documents necessary for an audit of his books and records and to make appropriate payment to Plaintiff as a result of that accounting.

7. As to the All Causes of Action:

a) For prejudgment and post-judgment interest, as allowed by law;

b) An award to Plaintiff of all costs, disbursements, and expenses; and

c) Such other and further relief, both at law and in equity, as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all claims and issues so triable.

Dated: September 8, 2026

MELONI & McCAFFREY LLC

By:__________________________
Robert S. Meloni

Meloni & McCaffrey LLC
3 Columbus Circle, 15th Floor
New York, New York 10019
Tel: (917) 331-9556; (212) 520-6090
Email: rmeloni@m2lawgroup.com

*Attorneys for Plaintiff Mark Buol*